## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 9:18-CV-80762-RLR

JACOB HORN and ROBERT VETTER,

      Plaintiffs,

v.

LIBERTY INSURANCE UNDERWRITERS, INC.,

      Defendant.

_____/

**LIBERTY INSURANCE UNDERWRITERS, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' *DAUBERT* MOTION TO STRIKE OR EXCLUDE THE EXPERT OPINIONS OF TIMOTHY J. FRANSEN AND STEPHEN D. JOHNSON**

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................... 1

II.  BACKGROUND ............................................................................................................ 2

    A.  Mr. Fransen's Report ............................................................................................ 2

    B.  Mr. Johnson's Report. ........................................................................................... 4

III. ARGUMENT .................................................................................................................. 7

    A.  Mr. Fransen's Opinions Are Admissible. ............................................................. 8

    B.  Mr. Johnson's Opinions Are Admissible. .......................................................... 11

        1.  Mr. Johnson is a Qualified Expert. ............................................................ 11

        2.  Mr. Johnson's Methodology is Reliable. .................................................... 13

IV.  CONCLUSION ............................................................................................................. 17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adega v. State Farm Fire and Casualty Insurance Co.*,
 07-20696-CIV, 2010 WL 11506354 (S.D. Fla. Mar. 30, 2010) ................................................8

*Allapattah Services, Inc. v. Exxon Corp.*,
 61 F. Supp. 2d 1335 (S.D. Fla. 1999), *aff'd*,
 333 F.3d 1248 (11th Cir. 2003),
 *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Services, Inc.*,
 545 U.S. 546 (2005)............................................................................................................14

*American General Life Insurance Co. v. Schoenthal Family*, LLC,
 555 F.3d 1331 (11th Cir. 2009) .............................................................................................9

*Bennett v. Behring Corp.*,
 737 F.2d 982 (11th Cir. 1984) ..............................................................................................10

*Cotromano v. United Technologies Corp.*,
 13-80928, 10-80840-CIV, 2018 WL 2047468 (S.D. Fla. May 2, 2018) ..................................7

*Culbreath Isles Property Owners Associationn, Inc. v. Travelers
 Casualty & Surety Company of America*,
 151 F. Supp. 3d 1282 (M.D. Fla. 2015),
 *aff'd sub nom. Sidman*, 841 F.3d 1197 ................................................................................14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
 509 U.S. 579 (1993)........................................................................................................8, 13

*Doctors Licensure Group, Inc. v. Continental Casualty Company*,
 3:10-CV-98-RV/MD, 2011 WL 13182969 (N.D. Fla. Sept. 26, 2011)............................12, 13

*Schneider ex rel. Estate of Schneider v. Fried*,
 320 F.3d 396 (3d Cir. 2003)..................................................................................................7

*Goolsby v. Gain Technologies, Inc.*,
 362 Fed. Appx. 123 (11th Cir. 2010)......................................................................................8

*Jimenez v. GEICO*,
 651 F. App'x 850 (11th Cir. 2016) .........................................................................................5

*Long v. East Coast Waffles, Inc.*,
 18-12920, 2019 WL 1091041 (11th Cir. Mar. 8, 2019) .........................................................16

*Mohamed v. American Motor Company, LLC*,
   320 F.R.D. 301 (S.D. Fla. 2017) ............................................................................11

*Physicians Healthsource, Inc. v. Dr. Diabetic Supply, LLC*,
   12-22330-CIV, 2014 WL 7366255 (S.D. Fla. Dec. 24, 2014) ................................11

*Regions Bank v. Cmmonwealth Land Title Insurance Co.*,
   11-23257-CIV, 2013 WL 3279939 (S.D. Fla. June 27, 2013) ...................................8

*Seamon v. Remington Arms Co., LLC*,
   813 F.3d 983 (11th Cir. 2016) ..................................................................................8

*Sidman v. Travelers Casualty and Sur*ety,
   841 F.3d 1197 (11th Cir. 2016) ..........................................................................5, 14

*Siplin v. Carnival Corp.*,
   17-CIV-23741, 2018 WL 3439452 (S.D. Fla. July 17, 2018) ...................................8

**Rules**

Fed. R. Evid. 702 ...........................................................................................7, 8, 9, 13

Federal Rule of Civil Procedure 23 ............................................................................10

Liberty Insurance Underwriters, Inc. ("Liberty") submits this response in opposition to Plaintiffs Jacob Horn and Robert Vetter, individually and on behalf of others similarly situated, as assignees of iCan Benefit Group LLC, a Florida limited liability company (collectively, "Plaintiffs")'s Daubert Motion to Strike or Exclude the Expert Opinions of Timothy J. Fransen and Stephen D. Johnson, D.E. 106, 115 ("Plaintiffs' Motion").  For the reasons set forth below, Liberty respectfully requests that this Court deny Plaintiffs' Motion.

## I.    INTRODUCTION

In this insurance coverage dispute, Liberty offers the opinions of expert Timothy J. Fransen as to the reasonableness of the underlying *Coblentz* settlement agreement (the "Settlement Agreement") with a particular focus on comparing it to other TCPA settlements. Liberty also offers the opinions of expert Stephen D. Johnson as to the issues of whether the negotiations culminating in the Settlement Agreement are indicative of good faith negotiations and reasonable from the perspective of the overall conduct of the parties.  Mr. Fransen and Mr. Johnson also rebut the opinions of Plaintiffs' two experts – (i) Seth M. Lehrman, who provided an opinion on whether the Settlement Agreement was reasonable (the "Lehrman Report") and (ii) Robert M. Klein, who provided an opinion on whether the Settlement Agreement was achieved through improper motive or collusion (the "Klein Report").

Plaintiffs' Motion argues that both Mr. Fransen and Mr. Johnson are unqualified to offer their respective opinions in this action because they supposedly have insufficient TCPA experience.  Plaintiffs do not challenge the reliability of Mr. Fransen's opinions, but they do challenge the reliability of Mr. Johnson's opinions because he did not compare the Settlement Agreement to other TCPA class action settlements as if that were the only relevant inquiry in a *Coblentz* enforcement action (it is not) and because he supposedly did not consider oral communications between Plaintiffs' and iCan's lawyers that Plaintiffs' Motion itself does not

identify and that that Plaintiffs' and iCan's lawyers could not recall during their recent depositions.

Plaintiffs' Motion's criticisms of Mr. Fransen's and Mr. Johnson's opinions are misguided and incorrect, and the Motion should be denied.

## II.     BACKGROUND

### A.     Mr. Fransen's Report.

As set forth in Report of Timothy J. Fransen ("Fransen Report") (Ex. A), Mr. Fransen is a partner at the law firm of Cosgrave Vergeer Kester LLP in Portland, Oregon.  Fransen Report, ¶ 2.  He graduated from the University of California, Hastings College of Law.  *Id.* ¶ 5.  He is admitted to practice in Oregon and Washington, and before the federal courts in the District of Oregon and the Eastern and Western Districts of Washington.  *Id.* ¶ 3.  He is a member of the Defense Research Institute, the Oregon Association of Defense Counsel, the Mulnomah County Bar Association, and the Oregon Bankers' Association.  *Id.* ¶ 4.  Since 2008, Mr. Fransen's practice has focused primarily on the defense of consumer protection claims under various state and federal laws, including but not limited to the TCPA.  *Id.* ¶¶ 6-7.  Mr. Fransen has participated as counsel in at least seven TCPA cases since 2010.  Ex. C, Decl. of T. Fransen, ¶ 4.  In the last five years, he has attended various programs and seminars dedicated to defense of consumer class actions, with an emphasis on TCPA litigation, put on by groups including the Defense Research Institute, the American Collectors' Association, and the American Conference Institute.  *Id.* ¶ 8.

In his Report, Mr. Fransen opines that the Settlement Agreement was "not reasonable under the circumstances."  *Id.* ¶ 16.  In addition to reviewing the Lehrman Report, Mr. Fransen reviewed the dockets and key filings from many of the cases disclosed in Exhibit B of the Lehrman Report, as well as the Klein Report and the key pleadings, motions and orders from the

underlying iCan action, styled *Jacob Horn, et al., v. iCan Benefit Group, LLC*, Case No. 9:17-cv-81027-RLR, in the Southern District of Florida (the "iCan Lawsuit"). *Id.* ¶¶ 10-12.

Mr. Fransen's opinion, as set forth in his report, focuses on (i) the amount of the settlement and (ii) the speed and informality in which the settlement was consummated. *Id.* ¶ 17. He discusses in detail twelve TCPA class actions involving settlements of $20 million or more, seven of which Mr. Lehrman did not address in his own report. *Id.* ¶¶ 19, 23, 24. In every case, the settlement was reached with assistance of a third-party neutral. *Id.* ¶ 24. Similarly, the settlement in every case was reached only after enough time had passed to allow the full exchange of information and the development of defenses. *Id.* And finally, on average, the settlement agreement was reached approximately two years after the case was filed. *Id.* As set forth by Mr. Fransen, these reoccurring facts are absent from the iCan Lawsuit settlement negotiation, where the settlement was reached with exceptional speed, without the aid of any third-party neutral[1] and without the exchange of discovery. *Id.*

In addition to analyzing other TCPA settlements in far more detail than Mr. Lehrman did, the Fransen Report also identifies some important inaccuracies in the Lehrman Report. For example, of the eight settlements the Lehrman Report identifies as being over $20 million, two were resolved by jury trials (not settlement) and one was a $2.1 million settlement (not $21 million as stated by Mr. Lehrman). *Id.*

---

[1]    Discovery after Mr. Fransen submitted his report revealed that the parties did contemplate using a mediator, former Judge Fred A. Hazouri, to help determine a reasonable settlement sum because they though it could be useful to establishing the reasonableness of a settlement sum in a later proceeding to enforce a *Coblentz* agreement, Silber Dep. 70:20-72:9, but ultimately decided to not seek his assistance or opinion on reasonableness. All deposition transcripts referenced herein are attached to Liberty's Response to Plaintiffs' Motion in Limine.

B.     **Mr. Johnson's Report.**

As set forth in the Expert Report of Stephen D. Johnson ("Johnson Report") (Ex. B), Mr. Johnson has more than 30 years of claims and insurance experience in the property-casualty insurance industry.  Johnson Report, at 1.  He has held positions on the board of directors of insurance companies, and held various titles, including senior vice president, vice president, assistant vice president, associate general counsel and assistant corporate secretary.  *Id.*  At various times, he has served as the top claims executive for insurance companies, as well as a claims officer, claims counsel and claims consultant.  *Id.*  Mr. Johnson graduated from Texas Tech University in 1982 and is admitted to practice in Texas.  *Id.* at 2, 13.  He is a member of the Defense Research Institute, the Institutes' CLM, and the Property Casualty Insurers Association of America.  *Id.* at 13.  He has extensive experience overseeing, analyzing, and negotiating claims-based lawsuits and deciphering fraudulent claims.  *Id.* at 1-2.

Mr. Johnson reviewed the reports and attachments from Plaintiffs' expert witnesses, as well as key pleadings, motions, and orders from the iCan and Plaintiffs' initial document production in this action.[2]

The Johnson Report primarily focuses on "(i) the reasonableness of the $60M settlement amount; (ii) whether the settlement was tainted by bad faith, fraud or collusion; and (iii) whether there was a bona fide effort to minimize liability – i.e., whether iCan and its defense counsel engaged in reasonable advocacy to resist class certification, dispute allegations of violations of the TCPA and contest damages."  *Id.* at 3.  Regarding such inquiries, the Eleventh Circuit has affirmed a district court's denial of a motion for judgment as a matter of law (and thus, the jury's

---

[2]     At the time the Johnson Report and the Fransen Report were prepared, Plaintiffs' had provided their initial production of documents, which was later supplemented after Liberty noticed deficiencies in Plaintiffs' production.  Further, at the time, no depositions had been taken or scheduled.

verdict for the insurer) where the evidence demonstrated that "[n]o discovery was conducted before the parties entered into the *Coblentz* agreement. No depositions were taken. No interrogatories were sent. . .," there was a lack of meaningful factual development during the underlying case with no expert assessments conducted, and yet there was "generous[] compensat[ion]" for counsel through "contingency fees and costs." *Jimenez v. GEICO*, 651 F. App'x 850, 854 (11th Cir. 2016).  Similarly, in *Sidman v. Travelers Casualty and Sur*ety, 841 F.3d 1197 (11th Cir. 2016), the Eleventh Circuit questioned whether the insured acted as if its "own money [were] on the line" in reaching the *Coblentz* agreement, *id.* at 1206, and then clarified that "collusion" does not necessarily require that the insured in fact financially shared in any recovery made pursuant to the consent judgment, *id.* at 1205.  Rather, the Court upheld summary judgment in favor of the insurer because, among other things, evidence demonstrated that the only reason the insured "acquiesced to this arrangement because it believed that it could impose on [the insurer] all or most of the financial burden of the settlement agreement, with its own exposure limited to $50,000 pursuant to the side agreement." *Id.* at 1206.  The Court concluded: "Accordingly, we hold that an agreement in which an insured agrees to accept essentially any judgment amount that the injured party seeks in exchange for a promise to not execute against it is collusive for *Coblentz* purposes." *Id.*

In essence, Mr. Johnson considered whether iCan forcefully and diligently defended and negotiated to $60 million or whether iCan's actions were too cooperative or too fast-tracked. Johnson Report, at 5.  In reaching his opinion, Mr. Johnson first discussed what typically happens in civil litigation – a vigorous negotiation when a defendant has its own "skin in the game" and wants to minimize liability as much as possible. *Id.*

Reviewing the same information cited in Plaintiffs' own expert reports, Mr. Johnson recognized that iCan did not vigorously negotiate.  Notably, while both the Lehrman Report and the Klein Report vaguely describe settlement communications and discussions in an attempt to

convey that there were extensive negotiations between the parties, neither report provides any specific details regarding iCan's attempts to negotiate a low settlement number. *Id.* at 6-7. Mr. Johnson opines that this lack of detail in Plaintiffs' own expert reports indicates that iCan did not "act[] diligently to reduce class size, defeat class certification or otherwise vigorously defend." *Id.* at 8. He observed "minimal emails addressing the potential number of texts, but little analysis, no contested motion regarding class certification, no expert analysis, no discovery submitted to Plaintiffs', or any other activity to commensurate with a vigorous defense." *Id.*

In the Johnson Report, Mr. Johnson looked beyond the Plaintiffs' two expert reports for any other evidence that the parties negotiated in good faith. *Id.* at 8-12. Based on Mr. Johnson's review of the pleadings and Plaintiffs' document production, he notes that very quickly, the parties explored early case resolution. *Id.* at 8. However, Mr. Manuel Hiraldo (lead counsel for the Plaintiffs in the iCan Lawsuit) prior to judicial approval of the $60 million settlement, expressed to this Court that there had been "extensive negotiations."[3] *Id.* Mr. Johnson also highlights emails exchanged between the parties in mid-January indicating that Plaintiffs' and iCan came to an agreement on a settlement sum with exceptional speed. *Id.* at 9-10. And he observed that the parties canceled mediation because the action had supposedly settled but that cancellation was one day prior to any written evidence that the parties actually had reached agreement on a settlement sum. *Id.* Mr. Johnson opines that "it is more likely than not that before the number was agreed to, iCan already knew it was getting the only thing material to it – complete protection against the Horn matter. It would be very reasonable to assume iCan had an interest to allow the number to be high – not as low as an ordinarily prudent defendant would –

---

[3] Mr. Hiraldo also expressed to this Court that discovery was exchanged. However, Mr. Johnson notes that nothing in the record supports this statement – there were no requests for production, interrogatories, requests for admission, or designation of experts or depositions. *See* Johnson Report, pp. 8-9.

because iCan would not want to displease plaintiffs, causing them to rescind the deal that had plaintiffs foregoing any right to recover against iCan in exchange for assigning Liberty policy rights to the class." *Id.*  He further opines that the parties' negotiations were not "not indicative of true arm's length negotiations or, as described by counsel in the [iCan Lawsuit to this Court], 'extensive negotiations.'" *Id.* at 11.

The Johnson Report addresses a January 12, 2018 email in which iCan purports to analyze and set a class size but mentions "sampling" and "guessing" used to arrive at an estimated total number of offending texts sent. *Id.* at 9-10.  Mr. Johnson opines that "this email is reflective of a defendant which has nothing to lose because it knew it would never be obligated to pay." *Id.* at 10.  Further, he explains that in a "truly contested and zealously litigated case" a math or statistics expert would have been engaged by the parties, but no experts were retained in the iCan lawsuit.  *Id.*

## III.   ARGUMENT

The Federal Rules of Evidence permit expert testimony as follows:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Rule 702 embodies a "'trilogy of restrictions' that expert testimony must meet for admissibility: qualification, reliability and fit.'" *Cotromano v. United Techs. Corp.*, 13-80928, 10-80840-CIV, 2018 WL 2047468, at *14 (S.D. Fla. May 2, 2018) (*quoting Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003)).

Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Thus, Rule 702 "compels district courts to perform a 'gatekeeping' role concerning the admissibility of expert testimony." *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 988 (11th Cir. 2016) (*citing Daubert*, 509 U.S. at 597). However, "[t]he admissibility standard is a liberal one ... and the rejection of expert testimony is the exception rather than the rule." *Siplin v. Carnival Corp.*, 17-CIV-23741, 2018 WL 3439452, at *7 (S.D. Fla. July 17, 2018) (emphasis in original). Exclusion of expert testimony is the exception, rather than the rule, because "[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Adega v. State Farm Fire and Cas. Ins. Co.*, 07-20696-CIV, 2010 WL 11506354, at *1 (S.D. Fla. Mar. 30, 2010) (quoting *Daubert*, 509 U.S. at 595). Thus, "the threshold question in determining the admissibility of an expert's testimony is whether the testimony helps the fact finder resolve an ultimate issue in the case." *Regions Bank v. Cmmw. Land Title Ins. Co.*, 11-23257-CIV, 2013 WL 3279939, at *1 (S.D. Fla. June 27, 2013).

### A.   Mr. Fransen's Opinions Are Admissible.

Plaintiffs' argue that Mr. Fransen's opinions are inadmissible under Rule 702 based on Mr. Fransen's qualification only and do not challenge the reliability or fit of his opinions. Mr. Fransen is well-qualified to opine as to the reasonableness of the Settlement Agreement.

"[E]xpert opinion testimony on issues to be decided by the jury, even the ultimate issue, is admissible where the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves; i.e., the conclusion is beyond the ken of the average layman." *Goolsby v. Gain Techs., Inc.*, 362 Fed. Appx. 123, 134–35 (11th Cir. 2010). "For nonscientific expert testimony, the trial judge must have considerable leeway in deciding in a particular case how to

go about determining whether particular expert testimony is reliable.  A district court may decide that nonscientific expert testimony is reliable based upon personal knowledge or experience." *Am. Gen. Life Ins. Co. v. Schoenthal Fam.*, LLC, 555 F.3d 1331, 1338 (11th Cir. 2009) (internal citations and quotations omitted).  Mr. Fransen's knowledge and experience qualify him to provide his expert opinions in this action.

Plaintiffs ask this Court to apply Rule 702 in an unreasonably narrow manner.  Mr. Fransen is experienced in litigating both consumer class action and TCPA cases, *see* Fransen Report, ¶¶ 6, 7; Fransen Decl., ¶ 4, and is more than qualified to opine on whether the third largest TCPA class action settlement in the history of TCPA class action settlements was unreasonable and whether it was inconsistent with the features of the very TCPA settlements that Plaintiffs' experts claim are comparable, *see* Fransen Report, ¶ 18; Fransen Decl., ¶ 4.  Mr. Fransen's opinion is based on his review of the facts underlying other TCPA class action settlements, his experience as a class-action lawyer and his experience representing clients in TCPA cases.  *See* Fransen Report, ¶¶ 19-25; Fransen Decl., ¶ 4.

Contrary to the implications of Plaintiffs' Motion, there is no requirement under the Federal Rules or in the Eleventh Circuit that Mr. Fransen must have litigated a set number of TCPA class action cases that resulted in a settlement in order to provide an opinion on reasonableness in this action.  And, Plaintiffs' Motion actually offers no such benchmark.  Mr. Fransen has extensive knowledge and experience litigating class action settlements, and as Plaintiffs' Motion observes, that includes the TCPA.  He also has researched TCPA litigation extensively.  *See* Fransen Report, ¶ 8.

That Mr. Lehrman supposedly has personal experience with a greater quantity of "TCPA" class action cases than Mr. Fransen is irrelevant.  Both Mr. Fransen and Mr. Lehrman relied on their own experience litigating class action cases, including TCPA claims, as well as their study of other TCPA actions they were not involved in.  In fact, the Lehrman Report

erroneously confuses the issues pertinent to this action by analyzing the Settlement Agreement in relation to Federal Rule of Civil Procedure 23 and *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984), as opposed to under the factors relevant in a *Coblentz* enforcement action.  At best, Mr. Lehrman's "TCPA-specific" analysis is limited to attaching a chart (apparently created by Plaintiffs' counsel)[4] and writing in a single paragraph that the Settlement Agreement supposedly fits within the range of settlements identified in the chart.  Lehrman Report, at 15-16. Unlike Mr. Fransen, Mr. Lehrman offers no analysis of the facts underlying those cases to meaningfully compare them to the Settlement Agreement.

Mr. Fransen rebuts the Lehrman Report and engages in more than a superficial comparison of numbers (as Mr. Lehrman did); he evaluates the facts of each case against the iCan Lawsuit, taking into consideration (i) the length and timing of the settlement negotiations, (ii) whether the parties engaged in discovery prior to reaching a settlement agreement, (iii) whether the parties engaged a third-party neutral to assist with negotiations, (iv) whether the parties engaged in any motion practice, and (v) whether the Settlement Agreement included any required changes to the TCPA-violator's business practices.  Fransen Report, ¶¶ 18-29.

In sum, Plaintiffs do not even challenge the reliability or fit of Mr. Fransen's opinions. Instead, they challenge only his qualifications, but Mr. Fransen is more than qualified to conduct the analysis he conducted and to testify to his opinions at trial.  Plaintiffs' Motion should be denied.

---

[4]     The Klein Report states: "Finally, I reviewed a chart which had been prepared by counsel reflecting class action settlements in other Telephone Consumer Protection Act matters, for purposes of comparison," Klein Report at 1-2, but does not attach the chart.  Presumably it is the same chart attached to the Fransen Report.

### B.    Mr. Johnson's Opinions Are Admissible.

*1.    Mr. Johnson is a Qualified Expert.*

Plaintiffs' argument that Mr. Johnson is unqualified to offer opinions in this action based on a supposed lack of specific experience in TCPA class action litigation is without merit.

Mr. Johnson has years of experience handling claims in the insurance industry.  Johnson Report at 1-2.  Mr. Johnson has held various executive positions at insurance companies, including serving as top claims executive, senior vice president, vice president, assistant vice president, associate general counsel and assistant corporate secretary.  *Id.*  Mr. Johnson has also served on the board of directors of various insurance companies.  *Id.*  Further, he has extensive experience overseeing, analyzing, and negotiating claims-based lawsuits and deciphering fraudulent claims.  *Id.* at 1-2.  Further, the Johnson Report demonstrates his understanding of the key issues in the case in detail.  Simply put, Mr. Johnson is eminently qualified to opine on how reasonable defendants comport themselves in negotiations, what sort of conduct parties engage in when truly negotiating at arm's length with a defendant attempting to minimize liability, and to compare the evidence (or lack thereof) of negotiations in this action to what one should expect to see in good faith negotiations.

Plaintiffs' simplistic criticism that an expert in this action must be a TCPA lawyer to opine as to whether a defendant acted as if its own skin were in the game or that it comported itself in a good faith, non-collusive, and vigorous manner while seeking to minimize liability is not true.  The TCPA is not a "complex regulatory scheme, subject to different, reasonable interpretations."  *Physicians Healthsource, Inc. v. Dr. Diabetic Supply, LLC*, 12-22330-CIV, 2014 WL 7366255, at *10 (S.D. Fla. Dec. 24, 2014) (rejecting defendants' argument that class certification "would subject them to potentially ruinous liability on the basis of an unintentional, technical violation of a confusing regulation that caused no economic harm to the class."); *see also Mohamed v. Am. Motor Co., LLC*, 320 F.R.D. 301, 317 (S.D. Fla. 2017).  In fact, if

Plaintiffs' arguments were true, their own expert must be disqualified as Robert Klein does not disclose any TCPA experience in his own Report.[5]

Plaintiffs' Motion also misquotes and misplaces reliance on *Doctors Licensure Group, Inc. v. Continental Casualty Company*, 3:10-CV-98-RV/MD, 2011 WL 13182969 (N.D. Fla. Sept. 26, 2011). In granting the defendant insurer's motion to preclude the testimony of the offered expert, Mr. Michels, the court emphasized Mr. Michels' own admission at his deposition that he lacked experience to opine on the reasonableness of the underlying settlement. *Id.* at *5 ("Because he is by his own admission not qualified to testify as to the strength of [the plaintiff's] allegations and the defenses [the defendant CPA] may have had thereto, he is obviously unqualified to testify that the settlement between [the parties] was reasonable.").[6] Both times that Plaintiffs' Motion purports to quote *Doctors Licensure Group*, *see* D.E. 106, Plaintiffs' Mot. at 4, 5, intentionally omits the key word "admittedly" that the district court specifically underlined in the opinion. The full quote reads, "In short, if Michels <u>admittedly</u> does not have the qualifications necessary to form an opinion on the merits of the case, how can he possibly evaluate and offer expert witness testimony on the reasonableness of a settlement reached in that case? Obviously, he cannot." *Id.* (emphasis in original).

Unlike in *Doctors Licensure Group*, Liberty and Mr. Johnson absolutely do not admit that Mr. Johnson does not have the qualifications to offer the opinions he has offered in this

---

[5]     Similarly, iCan's own lead counsel in the underlying action, Mr. Dunkel, had no TCPA experience prior to handling the iCan Lawsuit. *See* Dunkel 27:17-24, 28:3-12. Ms. Fineman estimated she had handled "eight or 10" TCPA litigations prior to the iCan Lawsuit, one of which was only a demand letter sent by plaintiffs' counsel. *See* Fineman 4:14-22.

[6]     Mr. Michels admitted he (i) did not know the elements of the underlying claim, (ii) did not know what affirmative defenses were available to the defendant, (iii) did not know what the defendant alleged wrongful conduct was, and (iv) did not know how the defendant violated the professional standard of care. *Id.* at *5.

action.  He is well qualified to testify to his opinions on whether the circumstances surrounding the negotiations of the Settlement Agreement are indicative of an unreasonable settlement that is tainted by bad faith, fraud, or collusion, and was reached without any effort by the defendant to minimize liability.[7]

### 2.    *Mr. Johnson's Methodology is Reliable.*

Plaintiffs also argue that Mr. Johnson's opinions are inadmissible under Rule 702 on the basis of reliability.  They argue that Mr. Johnson's methodology is flawed for the following two reasons: (i) with respect to reasonableness, for not specifically comparing the settlement of the iCan Lawsuit to other TCPA class action settlements, and (ii) with respect to good faith, for supposedly reviewing only emails between the underlying counsel in the iCan Lawsuit regarding their negotiations.  Again, Plaintiffs ask this Court to apply Rule 702 in an unreasonably narrow manner and their arguments should be rejected.

The Eleventh Circuit and the Southern District of Florida have explained that the focus under *Daubert* is not on conclusions drawn by the expert, but rather the reasonableness of the expert's approach.

> The focus is not on the conclusions generated by the expert's methodology, but on the reasonableness of the expert's use of such an approach, together with his or her particular method of analyzing the data obtained, to draw a conclusion regarding the specific matter to which the expert testimony is directly relevant. Kumho, 526 U.S. at ——, 119 S.Ct. at 1177. The "overarching" goal of Daubert's gate-keeping requirement "... is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

---

[7]    In *Doctors Licensure*, Mr. Michels also apparently only offered an opinion as to reasonableness and not as to whether negotiations were conducted in good faith.  *Id.* at *4-5.

*Allapattah Services, Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1335, 1339–40 (S.D. Fla. 1999), *aff'd*,
333 F.3d 1248 (11th Cir. 2003), *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Services, Inc.*,
545 U.S. 546 (2005).

 Mr. Johnson's approach in reaching his expert opinion is reasonable.  First, a comparison
to other TCPA settlements is only one potential data point of a reasonableness analysis, but the
overall question the jury must consider is whether iCan acted as if "its own money [were] on the
line."  *Sidman*, 841 F.3d at 1206; *see also Culbreath Isles Prop. Owners Ass'n, Inc. v. Travelers
Cas. & Sur. Co. of Am.*, 151 F. Supp. 3d 1282, 1290 (M.D. Fla. 2015) ("Some courts have
evaluated reasonableness under *Coblentz* by examining what settlement a reasonable person in
the position of the insured would have reached on the merits of the plaintiff's claims if the
insured was required to pay the settlement itself."), *aff'd sub nom. Sidman*, 841 F.3d 1197.  Mr.
Fransen's report focuses on a comparison to other TCPA class action settlements, while Mr.
Johnson's report reviews the broader picture of the parties overall conduct surrounding the
negotiations of the Settlement Agreement, although Mr. Johnson does compare the Settlement
Agreement to one of the cases that Mr. Lehrman noted.  Johnson Report, at 7-8 ("Interestingly,
Lehrman refers to a TCPA auto-dial class action he handled as an attorney wherein a $12M
settlement fund was available for 6.9M consumers.  $12M ÷ 6.9M = $1.74 per consumer.")

 Second, Plaintiffs' criticism that Mr. Johnson only relied on emails and not oral
communications between the underlying counsel in the iCan Lawsuit is absurd and actually
highlights the lack of evidence of good faith negotiations between Plaintiffs and iCan.  Mr.
Johnson pointed out that communications between Plaintiffs and iCan regarding a settlement
sum appear limited to just a short window of a couple of days from January 14-16 or even

possibly just January 14-15.  *See* Johnson Report, at 7-8, 10-11.  Mr. Johnson's observation is

accurate and consistent with the record.[8]

In fact, there is no evidence in the record of any meaningful oral communications about

settlement prior to that window of time and Plaintiffs' Motion does not identify any.  Subsequent

to Mr. Johnson's Report, counsel for Plaintiffs and counsel for iCan had the opportunity to

testify under oath, and they could identify no oral communications regarding any exchange of

settlement sum numbers prior to January 14.  As Mr. Hiraldo testified:

> Q.      Okay. You might have, you might not have; but sitting here today,
> as far as you are aware, is this email on Sunday, January 14th, 2018 at
> 2:36 p.m. the earliest communication that you can recall in which either
> party had put a dollar figure on a settlement in the case?
> A.      I think that this reflects the first written -- formal written demand
> to the defendants.
> Q.      But -- and do you recall any specific oral communications
> conveying a demand or an offer with an actual settlement sum being
> communicated prior to this email?
> A.      I do not.

M. Hiraldo 204:17-205:9.  Mr. Dunkel also could not recall any oral communications in which

either party offered a settlement figure prior to January 14.  Dunkel 187:15-188:10.

The post-expert report depositions also revealed that the parties had exchanged even less

information during the underlying action than previously represented.  *See, e.g.*, M. Hiraldo

43:24-45:21 (confirming that all "informal" discovery between the parties was limited to (i) the

financial documents temporarily provided to, and taken back from, Plaintiffs on December 1, and

(ii) the December 28 chart and January 12 email supposedly analyzing class data); *id.* (not

---

[8]      At the time of Mr. Johnson's report, Mr. Johnson only had available to him Plaintiffs'
initial production, which was deficient and later supplemented by Plaintiffs on February 22,
2019, after Mr. Johnson's report was due.  Thus, his report is based on the *exact same* documents
relied on by Mr. Klein and attached as Exhibit A to the Klein Report.  *See* Johnson Report at Ex.
B.  Depositions of all attorneys involved in the "negotiations" between Plaintiffs and iCan
occurred after his report was due.

recalling if any further information that was communicated to Plaintiffs other than what appears in the documents).

Plaintiffs' criticism of Mr. Johnson's report for not considering oral communications between Plaintiffs and iCan that either never occurred or no witness can recall does nothing to demonstrate the unreliability of Mr. Johnson's opinions.  It actually highlights the unreasonableness of the settlement and lack of good faith negotiations between the parties.[9]  As the opinions set forth in the Johnson Report will assist the trier of fact and Plaintiffs have offered no valid challenge to Mr. Johnson's methodology, Plaintiffs' Motion should be denied.

---

[9]   Even if there were oral communications that existed and he ignored (which he did not), the Johnson Report complied with the Rule 26 notice requirements to put Plaintiffs' on notice of his opinions and to provide Plaintiffs' with the opportunity to prepare effective cross-examination.  *See Long v. E. Coast Waffles, Inc.*, 18-12920, 2019 WL 1091041, at *1 (11th Cir. Mar. 8, 2019) ("The disclosure requirements aim to provide parties with a reasonable opportunity to prepare effective cross examination and arrange for rebuttal testimony from other experts if needed.")

## IV.    CONCLUSION

For all of the foregoing reasons, Plaintiffs' Motion must be denied.  The opinions set forth in the Fransen Report and the Johnson Report are admissible in this case.

WHEREFORE, Defendant Liberty respectfully requests that the Court deny Plaintiffs' Motion.

| | |
|---|---|
| **COLE, SCOTT & KISSANE, P.A.** | **HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER** |
| /s/ *John Cody German* | /s/ *Ronald P. Schiller* |
| John Cody German | Ronald P. Schiller |
| (Florida Bar No. 58654) | Daniel J. Layden |
| Email: Cody.German@csklegal.com | John S. Stapleton |
| COLE, SCOTT & KISSANE, P.A. | Mia S. Rosati |
| Cole, Scott & Kissane Building | *Admitted Pro Hac Vice* |
| 9150 South Dadeland Boulevard | Email: rps@hangley.com |
| Suite 1400 | HANGLEY ARONCHICK SEGAL PUDLIN & |
| Miami, Florida  33156 | SCHILLER |
| Telephone: (305) 416-3180 | One Logan Square |
| | 27th Floor |
| *Counsel for Defendant Liberty Insurance* | Philadelphia, PA 19103 |
| *Underwriters, Inc.* | Telephone: (215) 568-6200 |
| | |
| | *Counsel for Defendant Liberty Insurance* |
| | *Underwriters, Inc.* |

### CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of March, 2019, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

/s/ John Cody German